**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **KELLY DANIEL BASS,** | ) | |
| **Petitioner,** | ) | **Civil Action No. 7:22cv00259** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD W. CLARKE,** | ) | **By:  Robert S. Ballou** |
| **Respondent.** | ) | **United States District Judge** |

Petitioner Kelly Daniel Bass, proceeding *pro se,* has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the convictions and sentence imposed by the Cumberland County Circuit Court in 2018.  Respondent has filed a motion to dismiss.  After considering the entire record, I must **GRANT** the motion to dismiss for the reasons stated below.

## I.  BACKGROUND

On September 27, 2016, a grand jury in Cumberland County indicted Bass for aggravated sexual battery in violation of Virginia Code § 18.2-67.3, animate object penetration of a child younger than 13 years in violation of Virginia Code § 18.2-62.2, indecent liberties with a minor in violation of Virginia Code § 18.2-370.1, and two counts of forcible oral sodomy with a child younger than 13 years in violation of Virginia Code § 18.2-62.1.  Following a trial before the judge without a jury on July 11, 2017, one oral sodomy charge was struck for insufficient evidence; the court convicted Bass of the remaining four charges.  After consideration of a presentence report and psychosexual evaluation, the court imposed the required mandatory life sentence for the oral sodomy conviction, 40 years (20 suspended) for animate object penetration, 20 years (10 suspended) for aggravated sexual battery, and 10 years (5 suspended) for indecent liberties with a minor, resulting in a total sentence of life plus 70 years, with 35 years suspended, conditioned on 40 years of good behavior and 5 years of supervised release.  Bass's challenges to

these convictions require a detailed discussion of the procedural history of the case in addition to a summary of the evidence.

## A. Factual Background

The victim, D.B., age 9 at the time of the trial, testified by closed-circuit television, pursuant to Virginia Code § 18.2-67.9. She identified Bass as her cousin, who lived with his parents, her Uncle Danny and Aunt Brenda. She spent a lot of time at their house, especially on weekends, including at the end of February 2016. Bass spent time playing games with her in his room, including video games and hide-and-seek, and they jumped on the trampoline, went bowling, went to the movies, and watched television together. At night, she usually slept on the couch in his room, but she was afraid of the dark, so when he turned off all the lights, she asked him to hold her hand. He could not reach her hand on the couch, so she would crawl into his bed. She slept in pajamas, and he slept in shorts and a t-shirt. R.[1] at 1125–1213.

D.B. testified that Bass had kissed her on the lips and licked her boobs. Using anatomically correct drawings of an adult male and a female child, she identified the parts of her body that Bass had ever touched, marking her lips, breasts, butt, and female genitalia (which she called her "hoochie coochie"), and identified the male genitalia as the place she touched with her hands and her mouth. She said that Bass's "thing" looked like the male genitalia on the drawing, except that Bass did not have any hair there. *Id.* at 1168. Bass also wanted her to touch him. They watched movies together of naked people doing things with each other. By December 2015, he was asking her to touch his "thing" and suck it, and he was putting his "thing" in her "hoochie coochie." *Id.* at 1145–1148. On three or four occasions, she saw white liquid coming

---

[1] Citations to "R." refer to the record of Cumberland County Circuit Court in *Commonwealth v. Bass*, Record Nos. CR16000026-00 through CR16000026-04, using the page numbers in the lower right corner of each page.

out of his thing, and he wiped it off with a rag. *Id.* at 1160–1161.  These events last occurred at the end of February 2016.  She said that Bass bought her toys and gave her gifts for doing what he asked, including a locket with a picture of the two of them inside it.  He also took a picture of her naked with the camera on his DS.  D.B. reiterated that Bass touched her privates, licked and sucked her breasts, and put his thing inside her a little.  She denied that he ever licked her privates. *Id.* at 1211.  She touched his privates and put her mouth on it.  She denied ever touching his butt and denied ever tasting the white stuff. *Id.* at 1205.

On direct examination, D.B. testified that Bass told her not to tell anyone or he would go to jail.  On cross examination, she admitted that Bass told her to tell her mom that these things happened so her mom would spend more time with her.  She later clarified that when he was happy, he told her not to tell anyone, but when he was sad, he told her to tell her mother.  She told her mother in March 2016 because her mom asked her if anyone had been touching her. *Id.* at 1203–1204.

D.B.'s mother testified that she and her husband went out to dinner on February 27, 2016, for a date night.  She left D.B. at her brother's house, where her brother Danny, his wife Brenda, and their kids were all at home.  On March 13, 2016, when she was preparing for her daughter's bath, she noticed marks on D.B.'s breasts that resembled stretch marks.  She had seen them before in January or February, but they seemed to be getting worse.  She asked D.B. what happened to her breasts, and D.B. said she didn't know.  She then asked if anyone had done something to her, and D.B. started crying and told her that Bass had been sexually abusing her.[2] Her testimony was admitted under the fresh complaint doctrine.  Mrs. B. also testified that she

---

[2] D.B.'s statements to her mother were not entirely consistent with her trial testimony.  According to her mother, D.B. claimed that Bass licked her private parts and put his fingers and penis in her rectum, in addition to the other items claimed.

had been concerned about D.B. for about a year before March 2016, because D.B. started having nightmares and migraine headaches, had started hoarding food in her room, and had gone from good grades to failing grades at school.  She took D.B. to the hospital for an examination on March 15, 2016, spoke to a Sheriff's deputy the next day, and started D.B. in counseling shortly afterward.  D.B.'s headaches had stopped, and her grades had improved by the time of trial.  *Id.* at 1083–1111.

Captain Ownby, a deputy sheriff with the Cumberland County Sheriff's Office, testified that he first saw Bass on March 15, 2016, when Bass came into the office with his mother and grandfather.  He told the dispatcher that he was there to turn himself in for child molestation, but there were no warrants for him.  Bass spoke to Ownby alone, and Ownby recorded the conversation.  Bass said that his cousin, D.B., had told him she was not getting enough attention from her mother at home; he said he told her to tell her mom that he was sexually abusing her, and she would get all the attention she needed.  He said he told her exactly what to say and how to say it.  He claimed he had a close, powerful relationship with D.B. because she had been supportive of him, and he was trying to be supportive back.  After their conversation, Bass and his family left.

Ownby spoke with Mrs. B. the next day and the hospital's forensic nurse examiner.  An arrest warrant was issued for Bass, and he turned himself in on March 17, 2016.  The next morning, Ownby brought Bass back to the Sheriff's Office to collect a DNA sample and took a formal statement from him at that time, after reading him his *Miranda* rights.[3]  This time, Bass described the same activities with D.B. that he described on March 15, but Bass described them

---

[3] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court announced a rule requiring officers to advise suspects of their right to remain silent and right to have an attorney before conducting custodial interrogation.  Based on the case, those rights have become known as *Miranda* rights.

as events that had actually taken place.  He said that the physical relationship had been going on for about a year, starting with fondling over the clothing and progressing.  By December 2015, he admitted that they were having oral sex with each other.  He said he tried to have intercourse with her, but he could not get in.  He admitted watching pornographic movies with D.B. and taking a picture of her butt with his DS.  The Commonwealth introduced and played the recording of this statement.  *Id.* at 1442.

Ownsby executed a search warrant at Bass's home and seized the DS, two thumb drives, bedsheets, and a towel from Bass's bedroom, which he submitted to the Department of Forensic Science for analysis.  No naked pictures of D.B. or her butt were found.  The court did not permit Ownsby to testify about the contents of the flash drive, because Ownsby did not look at the drives, only the report from DFS (which was not introduced into evidence).  *Id.* at 1216–1248.

Lori Seman, a serology and DNA examiner for the Virginia Department of Forensic Science (DFS), testified about the DNA analysis of the bedsheets and towel and the comparison with the known DNA swabs taken from D.B. and Bass.  No seminal fluids were found on anything, but there were three spots of blood on one of the sheets; the DNA profile from one of the spots was consistent with D.B.'s DNA, with a probability of that spot coming from someone else being 1 in 7.2 billion.  *Id.* at 1250–1293; 1435–1438.

The only remaining prosecution witness, Deputy Matthew Seal, testified about chain of custody matters when he picked material up from DFS after the forensic analysis.  *Id.* 1298–1299.

The defense case is best summarized by Bass's testimony.  Bass, age 26, testified that he suffered from depression most of his life.  He took medication as a child but had stopped all medication by the time he was 17.  He could not remember what medicines had been prescribed.

In early 2015, he became severely depressed when his brother's girlfriend accused him of molesting his two-year-old nephew (her child).  The accusation was withdrawn and never went to the police, but it bothered him so much that he attempted suicide by taking several Tylenol. Nothing happened.  Later, he told D.B. he wanted to kill himself and held a knife to his chest, but D.B. took the knife away from him.

Bass was close to his Aunt Cheryl, D.B.'s mom.  He said he had talked to her a lot about his problems with depression, and she understood because she had suffered depression, too.  She was the first relative to defend him when he was accused of molesting his nephew.  She also felt very strongly about sexual abuse and said she would shoot anyone who molested her daughter. He knew she had a gun, but he had never seen it.

When D.B. complained of not getting the attention she wanted from her mother, Bass thought that telling her to tell her mom that he was doing sexual things to her would be a win-win:  D.B. would get the attention she wanted from her mother, and her mother would shoot him and kill him, since he had been too much of a coward to kill himself.  He spent 15-20 minutes telling D.B. exactly what to say.  When his Aunt Cheryl (Mrs. B.) did not kill him, and he got arrested instead, he figured he would go to prison and get killed quickly.  Captain Ownby led him to believe that if he confessed, there would be no need for a trial, and he could go straight to prison, so he confessed.  He maintained throughout the trial that the confession was a lie and that he never did any of those sexual acts with D.B.  He denied ever taking a picture of D.B. naked, denied watching pornographic movies with her, and denied ever touching her inappropriately. He admitted giving her lots of gifts and toys because she was his favorite cousin, but he denied that these gifts were contingent on her performing sexual acts with him.  *Id.* at 1355–1402.

Before Bass testified, the defense re-called Mrs. B. as a witness.  Mrs. B. admitted owning a gun but denied ever saying she would shoot someone who sexually abused her daughter.  She admitted being a victim of sexual abuse herself.  She denied ever talking with Bass about depression.  *Id.* at 1315–1321.

The defense also recalled D.B., who admitted that Bass had told her he wanted to kill himself.  She did not recall ever taking a knife away from him.  She admitted that she had gotten caught watching an adult themed movie with nudity and sex on her i-pad, and that her mother restricted her to watching only children's programs.  *Id.* at 1344–1349.

Defendant's mother, Brenda Bass, testified that she and her husband lived in Cumberland County with defendant and his four younger brothers.  Bass had always lived at home, had never moved out on his own.  He did not have a driver's license and did not know how to drive.  He had very few friends and usually stayed to himself in his room.  She had taken him to see a mental health professional at Crossroads as a child.  Bass's primary care doctor put him on anti-depressant medication at age 11.  By the time he was 13 ½, the medicine had stopped working and the doctor switched him to a new one.  That medicine made Bass loud and angry, and the doctor took him off the new medicine after one week.  She was unaware of him being on any other medication for depression or seeing a therapist since then.  *Id.* at 1323–1340.

Brenda's sister, Muzet Felgar, corroborated Brenda's testimony that Bass did not have a lot of friends, did not smile often, and stayed to himself.  He was very quiet.  Even at family events, he often chose to stay in his room.  *Id.* at 1350–1354.

After hearing all the testimony, the trial court dismissed one oral sodomy charge based on D.B.'s direct testimony that Bass had not put his mouth on her genitalia.  However, he rejected Bass's testimony, finding D.B. more credible.

**B.  Procedural Background**

1.  <u>Pretrial Matters</u>

Bass was arrested on March 17, 2016, and charged with the offenses that occurred on or about February 27 – 28, 2016.  The Juvenile and Domestic Relations Court appointed counsel on April 1, and counsel promptly requested a psychological evaluation for competency to stand trial and sanity at the time of the offense.  Dr. Evan Nelson filed his report on June 10, 2016, finding Bass competent to stand trial.  *Id.* at 59–63.  On July 8, 2016, Bass waived his preliminary hearing.

The grand jury returned indictments against Bass on September 27, 2016.  *Id.* at 80–85. That same day, Bass and the Commonwealth Attorney appeared before the court.  Defense counsel was not present.  The prosecutor advised that "Bass has matters pending before the grand jury.  [Counsel] and I have agreed on a trial date of December 12, 2016 at 9:30."  *Id.* at 1061. The court instructed Bass to endorse the form continuance order and to continue cooperating with his attorney.  Bass did as he was instructed.  The form that set the initial trial date purported to be a continuance on defendant's motion and included a waiver of speedy trial rights.  *Id.* at 86.

On November 1, 2016, the parties and counsel endorsed an order setting the matter for a motions hearing on November 14, 2016.  *Id.* at 101.  The Commonwealth filed a motion to allow D.B. to testify by closed-circuit television (CCTV) pursuant to Virginia Code § 18.2-67.9.  The defense filed an objection to introduction of the DNA report.  On November 14, 2016, the court entered an order granting the use of CCTV, noting that Bass and his attorney had no objection. R. at 106.  The parties argued over the forensic report, but ultimately agreed that the prosecution would call a DNA expert to testify, subject to cross-examination.  The order memorializing this agreement was entered November 29, 2016.  *Id.* at 108.

On December 1, 2016, defense counsel filed a motion to continue the case, noting that Bass had been admitted to Central State Hospital on November 18, 2016, for a period of 30 days. Counsel further noted that he did not know how the hospitalization would affect Bass's ability to proceed with trial. The court continued the matter, on defendant's motion, to January 24, 2017 to pick a new date for trial. *Id.* at 112. Bass's hospitalization was extended to 60 days. On January 24, 2017, over the objection of the Commonwealth's Attorney, the matter was continued for trial till March 21, 2017. *Id.* at 113.

On March 21, 2017, the Commonwealth was advised that Bass no longer agreed to the use of CCTV for D.B.'s testimony, notwithstanding the previous agreed order. The Commonwealth was forced to request a continuance and asked the court to set another motions date before trial. Motions were scheduled for April 10, 2017, and the trial was scheduled for July 11, 2017. The defense objected to the continuance and refused to waive speedy trial. *Id.* at 117.

On March 27, 2017, defense counsel filed a motion to vacate the order allowing D.B. to testify by CCTV. On April 10, 2017, the court entered an agreed order for open file discovery (*Id.* at 153) and the parties argued the motion to vacate the order permitting CCTV, which the court denied. *Id.* at 228. Defense counsel requested a continuance of motions hearings, stating that he had another motion to file, and at the defendant's request, the motions date was continued to May 23, 2017. *Id.* at 154.

On May 1, 2017, defense counsel filed a motion to suppress Bass's second statement, taken March 18, 2016, by Captain Ownby, on the grounds that interrogation continued after Bass unequivocally invoked his right to counsel. *Id.* at 155–157. At the motion hearing on May 23, 2017, the court listened to the first approximately 12.5 minutes of the recorded statement from

March 18, 2016, which started with Ownby advising Bass of his *Miranda* rights.  After the

*Miranda* warnings, counsel interrupted and asked the court to clear the courtroom of non-parties,

because the names of the victim (not initials) and the defendant were referenced in the recording.

The court responded that "it is supposed to be a public trial."  *Id.* at 971.  The Commonwealth's

Attorney noted that only three people were in the courtroom, Bass's mother, an intern from the

Sheriff's Office, and the father of the defendant in an earlier case; nevertheless, she agreed that it

was important to protect the child's identity.  Defense counsel did not object to the Sheriff's

intern or his client's mother.  The judge indicated that it was a public hearing and he was not

ordering the third person to leave, but asked the man if he had a particular interest in the case and

if he would mind leaving voluntarily, to which the man answered "No" and then left the

courtroom.  *Id.* at 972–973.

The recording resumed, and at the 8 minute, 37 second mark, the following exchange

occurred:

> Bass:  Is there any way, uh, I could have, um, like an attorney or
> something present and, um, maybe a like a mental health
> professional?
>
> Capt. Ownby:  I don't have them here, if you want an attorney
> here, that's fine, but I can already tell you they're going to tell you
> don't tell anything, but that's up to you . . . . It's up to you . . . .
>
> Bass:  How should I start?

*Id.* at 155–156, 170–171.  Less than four minutes later, Bass asked, "What difference would it

make if I waited for a lawyer or a mental health professional?"  *Id.* at 171.  Ownby responded:

> I'm not required by law to provide you with a mental health
> professional.  If you want a lawyer, we can get you a lawyer, but I
> can already tell you that they won't let you tell us what happened.
> . . . If you intend to get a statement in about how you feel about her
> or whether you're remorseful or how it happened, this is your
> chance.  But it's up to you, I'm not going to deny you your rights.

*Id.* Finding that Bass's questions were not a clear, unequivocal assertion of his right to counsel, the trial court denied the motion. *Id.* at 989. The written order denying the motion was entered on June 2, 2017. *Id.* at 230–231.

    2. Trial Proceedings

During the bench trial on July 11, 2017, the parties realized prior to D.B.'s testimony that the CCTV system was not working properly. The telephone between the defendant, in the courtroom, and his counsel, in the same room with the child, was supposed to allow private communication between them during D.B.'s testimony. For an unknown reason, if Bass and his attorney were to speak on that phone, however, the conversation would play for the whole courtroom rather than remaining private. The court, with counsel's agreement, instructed Bass to take detailed notes during D.B.'s testimony, so that he could raise any issues with counsel, who would consult with him in person before beginning cross-examination and again before releasing the witness. If something urgent came up, he told Bass to raise his hand, and the court would get counsel's attention to consult with Bass immediately. Bass stated that he understood the court's instructions. *Id.* at 1111–1114. Bass took notes, and counsel consulted with him immediately after D.B's direct testimony. Counsel then requested an early lunch break, which the court permitted, so that he could spend some time talking further with Bass. *Id.* at 1162-1165.

After the lunch break, the Commonwealth Attorney noted that another case was set for 1:30 and asked the court to keep the parties and witnesses in the next case from entering the courtroom during the remainder of the child's testimony. Defense counsel stated, "No objection." *Id.* at 1167. The court instructed the bailiffs to make sure that the people did not enter the courtroom. Counsel then began cross-examination of D.B. At the end of his cross-examination, he consulted with Bass again and returned to ask a few more questions, based on

11

that consultation.  *Id.*  at 1199.  Bass did not raise his hand during the testimony at any point but consulted with counsel at the times noted.

Procedurally, the remainder of the trial was uneventful. The court found Bass guilty of four counts, as previously indicated, and ordered a presentence report and psychosexual evaluation.  The conviction order was entered August 29, 2017.  *Id.* at 238–239.  A few days before the scheduled sentencing hearing, defense counsel filed a motion to reconsider the verdict. *Id.* at 241–243.  On October 24, 2017, immediately before the sentencing hearing, counsel argued the motion for reconsideration, which the court denied.  *Id.* at 830–839.

Even though the sodomy charge carried a mandatory life sentence, counsel put on several witnesses at the sentencing hearing in addition to Bass: Defendant's mother, his father, and his cousin, Crystal Cook.  After the testimony of Mrs. Bass, the first witness, the judge asked counsel, "Is this gentleman . . .?"  Defense counsel interjected "He is not involved in our case. Considering the nature and the allegations in this case . . ."  At that point, the court reporter notes that "The spectator left the courtroom."  The judge said, "I didn't do anything.  I didn't stop him . . . it is a public setting so I have not made a ruling.  If the perceived problem has taken care of itself, that's fine, but it did not require a ruling on my part."  *Id.* at 876.

Bass maintained his innocence of the charges in his testimony and during his allocution. The court imposed its sentence of Life plus 70 years, with 35 years suspended, as previously explained.  The sentencing order was entered on January 11, 2018.

3.  Post-Trial Motions

In the days following the sentencing hearing, Bass filed several *pro se* motions, including a motion for a new attorney based on ineffective assistance of counsel (*id.* at 291–294), a motion for a new trial based on ineffective assistance of counsel (*id.* at 299–301), a motion to set aside

the verdict based on "suppression" of a medical report (*id.* at 287–289), and a motion for a new

trial with a new judge, alleging the trial judge was biased against him.  *Id.* at 310–312.  Defense

counsel filed a response to the *pro se* motions, denying all allegations of ineffectiveness, and

asking to be relieved as counsel.  *Id.* at 318–320.  Counsel also filed a motion to stay the

sentencing order until resolution of the pending motions.  *Id.* at 321–322.  On January 26, 2018,

the court entered an order staying the judgment order until April 2, 2018, scheduling a motions

hearing for February 27, 2018, and appointing new counsel for Bass.

On February 13, 2018, Bass filed a *pro se* motion to dismiss the charges for prosecutorial

misconduct and requested another new attorney.  *Id.* at 333–339.  At the motions hearing on

February 27, 2018, the court limited the hearing to the motion for another new attorney.  Bass

argued that he thought counsel had an inherent conflict because of practicing in the same legal

community as trial counsel and would be more interested in protecting trial counsel than helping

him.  Noting that counsel had not yet received the transcripts from the court reporter and that the

new attorney had just started looking at the issues in the case, the court found no conflict and

denied the motion for new counsel.  The remaining motions were scheduled for hearing on April

11, 2018.  *Id.* at 624–658.  Bass filed a written objection to the decision on March 2, 2018.  *Id.* at

344–345.

On March 28, 2018, the court received counsel's motion for a new trial on the grounds

that the telephone malfunction during the CCTV testimony violated Virginia Code § 18.2-67.9,

Bass's right to counsel, and his right to confront and cross-examine his accuser.  The court also

received Bass's *pro se* motion to vacate his conviction and dismiss the charges for violation of

his statutory speedy trial rights under Virginia Code § 19.2-243.  *Id.* at 348–355.  Those two

motions were argued at the motions hearing on April 11, 2018.  Noting that trial counsel agreed

13

with the CCTV procedure that was used because of the telephone malfunction, and that no objection to the procedure was made at the time, the court denied the motion for a new trial. *Id.* at 671–673. Argument on the speedy trial motion was continued to April 24, 2018, to give both sides more time to research. Counsel chose not to pursue the other post-trial motions that Bass had filed *pro se*, and the court emphasized that counsel, not Bass, was entitled to make that strategic decision. *Id.* at 693–694.

Between April 11, 2018, and April 24, 2018, Bass filed other *pro se* motions, including a motion for sanctions against the prosecutor, for return of property seized by the Sheriff's Office during the search of his home, and objecting to the court's failure to allow Bass to argue the *pro se* motions that counsel considered meritless. *Id.* at 376–382. The trial court did not docket these motions for hearing.

Following a lengthy hearing on April 24, 2018, the trial court ruled (1) that Bass had waived his speedy trial motion by failing to raise the issue until after sentencing and (2) that his speedy trial rights had not been violated. *Id.* at 819–820, 822. The court entered an order denying the motion that same day, also lifting the previous stay of the judgment order. *Id.* at 483.

### 4. Direct Appeals

Bass appealed his conviction, challenging the trial court's denial of his speedy trial motion, failure to identify specific date ranges counted against him and to explain the rationale for the ruling, denial of a new trial based on the telephone malfunction during the CCTV testimony of D.B., and denial of his motion to suppress. The Court of Appeals of Virginia affirmed the conviction, finding no error in the trial court's decision that Bass waived his speedy trial motion by not filing it before trial, noting that he waited until after he had been convicted

14

and sentenced before filing the motion. *Bass v. Commonwealth*, 829 S.E.2d 554, 564 (Va. Ct. App. 2019). Further, the trial court was not required to give a detailed explanation of his speedy trial calculations. The court found that Bass had waived his objection to the CCTV procedure used when the phone malfunctioned; not only did he fail to object to the procedure at the time, but trial counsel participated in deciding upon the procedure and agreed to it. *Id.* Finally, the court agreed with the trial court that a reasonable officer would not have understood Bass's questions to be an unambiguous request for counsel. *Id.* The Supreme Court of Virginia refused his petition for appeal on August 5, 2020, and denied his petition for rehearing on October 9, 2020. *Bass v. Commonwealth*, Record No. 191033 (Va.). He did not file a petition with the United States Supreme Court.

> 5. State Habeas Proceedings

Bass filed a state petition for habeas corpus in the Supreme Court of Virginia on May 25, 2021, raising several claims, all of which the court dismissed. As relevant here, the claims included denial of assistance of counsel, denial of right to a public trial, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. For both the denial of counsel and the denial of public trial claims, the court noted that these non-jurisdictional issues could have been raised at trial and on direct appeal but were not. Such issues are not cognizable in state habeas, which is not to be used as a substitute for appeal. *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va.1974). The court found no merit in the ineffective assistance of counsel claims. *Bass v. Clarke*, No. 210518 (Va. March 23, 2022).

## II. CLAIMS RAISED

In his § 2254 petition, Bass raised the following claims:

1. He was denied the assistance of counsel at the following stages of the proceedings:

    a.  When the initial trial date was set, without counsel present, and he was told to endorse a continuance order which waived his speedy trial rights;

    b.  When he could not communicate contemporaneously with his counsel during D.B.'s CCTV testimony because of the telephone malfunction; and

    c.  During post-trial motions, when the court essentially directed Bass to stop interrupting his attorney.

2.  He was denied his right to a public trial:

    a.  During the suppression motion, when the court asked a spectator if he would mind leaving the courtroom while the investigating officer testified about Bass's inculpatory statements, which included the child's name;

    b.  During D.B.'s CCTV testimony, when the court asked the bailiff not to allow the parties to the next case to enter the courtroom during the testimony; and

    c.  During the sentencing hearing, when an unknown spectator left the courtroom when counsel was about to request (but had not yet done so) that the courtroom be closed.

3.  Ineffective assistance of trial counsel:

    a.  Abandoning Bass by not appearing at the hearing to set the initial trial date;

    b.  Abandoning Bass during D.B.'s CCTV testimony;

    c.  Requesting and/or agreeing to close the courtroom at certain times, notwithstanding Bass's right to a public trial;

    d.  Failing to introduce the report of the forensic medical exam into evidence and telling the trial court there was no medical evidence;

    e.  Failing to hire an expert witness to explain the significance of the medical report;

    f.  Failing to file a motion to dismiss, before trial, based on violation of his right to a speedy trial; and

    g.  Cumulative prejudice from counsel's errors.

4.  Ineffective assistance of appellate counsel:

    a.  Failing to argue, under the ends of justice exception, that Bass was denied the right to counsel at stages in the trial; and

    b.  Failing to argue, under the ends of justice exception, that he was denied his right to a public trial.

5.  Actual Innocence.

### III. STANDARD OF REVIEW AND LIMITATIONS ON FEDERAL HABEAS

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal courts reviewing constitutional claims that have been adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A federal district court reviewing a § 2254(a) petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds. The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's

legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights.  *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).  When reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

**A.  Exhaustion**

A habeas petitioner is required to exhaust his claims in state court before his claims can be considered in federal court.  28 U.S.C. § 2254(b)(1)(A).  To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court, on the merits, before he is entitled to seek federal habeas relief.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  If a petitioner still has the right to pursue a state remedy by any available procedure, he has not exhausted his claim.  28 U.S.C. § 2254(c).  Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court.  *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995).  Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance.  *Coleman*, 501 U.S. at 732.

**B.  Procedural Default**

A separate but closely related issue is the doctrine of procedural default.  If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that

provides an independent and adequate ground for the state court's decision, that claim is procedurally defaulted for purposes of federal habeas review. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest state court and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered simultaneously exhausted and defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990). A claim that has not been presented to the highest state court and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered procedurally defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

## C.  Overcoming Procedural Default

Before a federal habeas court will consider a procedurally defaulted claim, the prisoner must show both cause for the default and actual prejudice as a result of the claimed federal violation. *Coleman*, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor, external to the defense and not fairly attributable to the prisoner. *Id.* at 756–57. To show prejudice to overcome procedural default, a petitioner must show that the claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

## IV. ANALYSIS OF CLAIMS

## A.  Denial of Assistance of Counsel

Although Bass raised three alleged instances of denial of counsel in his state habeas petition, the Supreme Court of Virginia did not consider the merits of the claims because they

should have been raised on direct appeal and were not.  Relying on *Slayton*, 205 S.E.2d at 682, and *Brooks v. Peyton*, 171 S.E.2d 243, 246 (Va. 1969), the court found the issue barred under state law.  *Slayton* has long been recognized as an independent and adequate state ground for procedural default.  *E.g., Smith v. Murray*, 477 U.S. 527, 533 (1986).  The Fourth Circuit Court of Appeals has also recognized *Brooks* as an independent and adequate state law ground barring consideration of the claim in federal habeas.  *Johnson v. Muncy*, 830 F.2d 508, 511–12 (4th Cir. 1987).  Because these claims have been procedurally defaulted, this court can consider them on the merits only upon a showing of cause and prejudice.  *Coleman*, 501 U.S. at 750.

Bass alleges that ineffective assistance of trial and appellate counsel is the cause for his default of these issues.  For reasons set forth more fully later in this opinion, Bass has failed to establish ineffective assistance of counsel, and thus, he has no cause for his procedural default.  Equally important, he cannot demonstrate any prejudice that "infect[ed] his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170.

1.  Initial Setting of Trial Date

Trial counsel and the Commonwealth Attorney had agreed upon December 12, 2016, as the initial date for trial.  On the day the grand jury issued its indictment, the Commonwealth Attorney advised the court, in Bass's presence, that she and counsel had already agreed on the trial date.  Counsel was not present, and the court had Bass sign the order.  The order was a pre-printed form normally used for continuance motions, and thus, not the best form to use for setting the initial trial date.  Bass can only show prejudice from this series of events if his speedy trial rights were infringed by counsel's absence.  They were not.

The proper assessment of a speedy trial claim involves a review of the whole record and consideration of trial court orders in context.  *Baity v. Commonwealth*, 431 S.E.2d 891, 895 (Va.

Ct. App. 1993).  When the indictment issued, no trial date had yet been set, and neither side

could move to "continue" a trial that had not been set.  *Nelms v. Commonwealth*, 400 S.E.2d 799,

801 (Va. Ct. App. 1991).  The time elapsing from the finding of probable cause (if there is a

preliminary hearing) or otherwise from issuance of the indictment until the initial trial date is not

a continuance within the meaning of Virginia's speedy trial statute.  *Turner v. Commonwealth*,

802 S.E.2d 814, 818 (Va. Ct. App. 2017).  The time from the indictment on September 27, 2016,

through the initial trial date of December 12, 2016, 76 days, counted against the Commonwealth

for speedy trial purposes.  If counsel had been present at docket call to sign the order, the result

would have been the same.  There is no prejudice to Bass from counsel's absence from court at

docket call, and he has failed to overcome his procedural default of this issue.

    2.  <u>CCTV and Malfunctioning Phone</u>

    Bass cannot show prejudice resulting from default of this issue.  As discussed in the

procedural background section, Bass took notes during D.B.'s direct testimony.  Counsel

consulted with Bass immediately after the direct examination and talked with him during lunch

as he prepared to cross-examine D.B.  Bass took notes again during cross-examination, and

counsel consulted with him before releasing the witness.  After this consultation, he returned to

ask a few more questions of the witness.  These consultations gave Bass ample time to

communicate concerns to counsel regarding D.B.'s testimony in a timely way, so that counsel

could benefit from the communication.  Further, the judge advised Bass that he could raise his

hand to get the judge's attention if he needed to consult with counsel immediately, rather than

waiting for the break in testimony.  Bass stated that he understood, but apparently did not choose

to raise his hand at any point.  Because he had the opportunity to consult, and did consult, with

counsel during D.B.'s testimony, he cannot show that he was prejudiced by the slight variation in the normal CCTV procedure.  He has not overcome his procedural default of this issue.

    3.  <u>Post-Trial Motions</u>

At the April 24, 2017, hearing on Bass's post-trial speedy trial motion, near the end of counsel's rebuttal argument (page 88 of a 100-page transcript), Bass presented a case to counsel and was otherwise consulting with counsel during the argument.  The court stated:

> Mr. Moore, I appreciate you needing to attend to him.  But it is 7:39.  We need to conclude at some point.  I'll listen to you, but I don't want these interruptions on this part.

R. at 817.  Bass argues that this prevented him from consulting with counsel, thereby depriving him of the right to counsel, during this part of the proceeding.  First, as the respondent has noted, Bass does not say what discussion he needed to have with counsel at that moment, nor does he explain how the outcome of the hearing would have been different if the court had not requested a reduction in interruptions.  Without such information, this court cannot find prejudice.  Moreover, as counsel was arguing a point of law, not questioning a fact witness, one can assume that the right to effective assistance of counsel is better preserved by allowing the attorney to argue the law without interruption from a layperson.  There is no prejudice to Bass, and he has not overcome his procedural default of this issue.

**B.  Denial of Right to Public Trial**

Just as in the denial of counsel arguments, the Supreme Court of Virginia held that Bass defaulted the three arguments in this category by not raising them at trial or on direct appeal.  That is an independent and adequate ground for procedural default.  Bass alleges ineffective assistance of counsel as the cause for his default; again, as will be discussed more fully below, Bass has not shown ineffective assistance of counsel.  Further, he has not shown any prejudice

that "infect[ed] his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Bass alleges that his right to a public trial was violated during the suppression hearing when the trial court asked a single spectator (the father of the defendant in an earlier case that day) if he would mind leaving the courtroom. At trial, after the lunch break, the trial court asked the bailiff to keep the parties for the afternoon case from entering the courtroom while the CCTV testimony was in progress. At sentencing, defense counsel asked about the people in the courtroom—who they were. Before counsel even asked to exclude people, a single unknown spectator left the courtroom. Bass's mother and an intern with the Sheriff's Office remained in the courtroom.

Bass has totally failed to explain how he has been prejudiced. Although the judge did not order the closure of the courtroom at any time, for the purposes of this decision, this court will presume that asking a single person if he would mind leaving the courtroom is a closure of some sort. Bass has not shown that the entire trial was "infect[ed] with error of constitutional dimension," *Frady*, 456 U.S. at 170, nor has he shown that the trial was rendered fundamentally unfair by the absence of this spectator, by the absence of the parties to the afternoon case, or by the absence of the person who left before a motion was made. Bass correctly argues that violation of the right to a public trial is structural error. Although the right is structural, it is subject to exceptions. *Weaver v. Massachusetts*, 582 U.S. 286, 298 (2017). "[S]afeguarding the physical and psychological well-being of a minor victim of sex crimes, including protecting them from further trauma and embarrassment, is precisely the type of compelling interest that can overcome the presumption in favor of an open trial." *Bell v. Jarvis*, 236 F.3d 149, 167–68 (4th Cir. 2000). Closing courtrooms to members of the public while a victim of sex crimes testifies— adult or child—has long been a common practice. *Id.* at 167.

Bass first asserted the violation of his public trial right in the state habeas case.  He neither objected at trial nor raised the issue on appeal.  While prejudice is presumed for structural errors on direct appeal, when the matter is raised in the context of a habeas claim for ineffective assistance of counsel, petitioner still has the burden of proving prejudice, either a fundamentally unfair trial or a reasonable probability of a different outcome.  *Weaver*, 582 U.S. at 301.  That is because prejudice is one of the two elements a petitioner must prove to establish ineffective assistance of counsel under *Strickland*.  Likewise, to overcome procedural default in a habeas case, a petitioner must show actual prejudice.  *Coleman*, 501 U.S. at 750.  Bass has not done so and cannot overcome his default on these public trial claims.

## C.  Ineffective Assistance of Trial Counsel

When reviewing counsel's performance, courts apply a highly deferential standard.  A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms."  *Id.* at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that his decisions were made in the exercise of reasonable judgement and that his actions fell within the wide range of reasonable strategy decisions.  *Id.* at 689–90.  To establish prejudice, a petitioner must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means "a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

As indicated previously, when applying the deference to attorney strategy required by *Strickland* along with the deferential standard of review required by 28 U.S.C. § 2254, a federal

habeas court is effectively limited to determining whether the state court had any reasonable ground for finding that counsel rendered effective assistance of counsel. *Owens v. Stirling*, 967 F.3d 396, 412 (4th Cir. 2000).  The question is not whether the "federal court believes the state court's determination under the *Strickland* standard was incorrect, but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirazavance*, 556 U.S. 111, 123 (2009).  "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

1. Counsel's Absence at Scheduling Hearing

Although Bass alleged in his state habeas petition that he was denied his right to assistance of counsel at the initial scheduling hearing, he did not couch the claim as ineffective assistance of counsel in that forum.  If the petitioner does not present the same operative facts and the same legal principles in state court that he seeks to present in federal court, and he no longer has a state remedy available, he has procedurally defaulted the legal claim that was not argued to the state. *Duncan*, 513 U.S. at 365–66.  Because this default has occurred in the context of a claim for ineffective assistance of trial counsel, a special test for cause and prejudice applies.

The Supreme Court has stated that a defaulted claim for ineffective assistance of trial counsel may be considered in federal habeas if the following requirements are met:  (1) The claim of ineffective assistance of counsel must be a "substantial claim."  (2) The "cause" for default is the absence of counsel, or ineffectiveness of counsel under *Strickland* standards, in the state habeas proceedings.  (3) The state post-conviction proceeding is the first time a petitioner can raise ineffective assistance claims under state law and is where petitioner first raised ineffectiveness. *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012).

Bass did not have counsel in the state habeas proceedings, and thus did not have legal assistance in understanding the difference between the court denying the right to counsel and denial of counsel resulting from counsel's ineffectiveness.  Further, in Virginia, claims for ineffective assistance of counsel are not cognizable on direct appeal; they must be raised only in a state habeas proceeding.  *Lenz v. Commonwealth*, 544 S.E.2d 299, 304 (2001).  The remaining requirement to overcome default is that the claim of ineffective assistance be substantial, which means that the claim "has some merit."  *Martinez*, 566 U.S. at 14.

This claim is not substantial because Bass has shown neither deficient performance nor prejudice.  The absence of counsel at the initial setting of the trial date, when the date has been agreed upon with the prosecutor, does not constitute deficient performance, because it did not fall below an objective standard of reasonableness under the prevailing professional norms at the time.  At the time Bass's case was scheduled for trial, agreeing to trial dates in advance, rather than appearing in court on grand jury day, was the professional norm in Cumberland County Circuit Court.  R. at 745.  Nor has Bass suffered any prejudice from counsel's absence, because the same trial date would have been set if counsel were present.  Also, the initial setting of the trial date did not impact his speedy trial rights.  The time from indictment until the initial trial date of December 12, 2016, counted against the Commonwealth, as previously discussed.  This claim has no merit and is not substantial, and Bass has failed to overcome his procedural default.

2.  Counsel's "Absence" from Bass during CCTV Testimony

As with the prior issue, Bass did not couch this claim as an ineffective assistance of counsel claim in his state habeas petition, and the ineffective assistance of counsel claim is procedurally defaulted.  Likewise, he cannot overcome his procedural default because this claim of ineffective assistance of counsel is not substantial.

Bass cannot meet the second prong of the *Strickland* standard because he cannot show

any prejudice resulting from the CCTV procedure that was used.  As summarized by the Court of

Appeals of Virginia:

> [W]hen the trial judge learned that the phone system was broken,
> he proposed the plan whereby Bass would "simply pick up this
> phone and say I need to speak to you" and if there was any
> problem with that procedure, Bass could raise his hand to get the
> judge's attention. . . . Bass's trial counsel [] did not object to the
> procedure and, in fact, actually told the trial judge that the
> proposed plan "sounds great."  The trial judge also confirmed with
> Bass that Bass understood the proposed procedure.

*Bass*, 829 S.E.2d at 562.  Additionally, counsel advised Bass to take notes about any concerns, so

that counsel could consult with him after J.D.'s direct testimony and before cross-examining her.

Bass understood the procedure, took notes, conferenced with counsel twice during J.D.'s

testimony, and made no objection to the procedure that his counsel had agreed to.  Because Bass

was able to consult with counsel in a timely fashion, before cross-examination of the witness and

before the witness was released, he has failed to establish what else he would have or could have

done if counsel had been sitting right beside him.  There is nothing to suggest that sitting beside

counsel or being connected with a telephone the entire time would have resulted in a different

outcome.  In the absence of prejudice, the claim for ineffective assistance of counsel has no merit

and must be dismissed as procedurally defaulted.

3.   Waiving Bass's Right to a Public Trial

The state habeas court held that Bass failed to establish prejudice because he did not

identify any way in which the outcome of the case might have been different if the father of the

previous defendant had remained in the room during the recorded statement played at the

suppression hearing, if the parties to the afternoon case had entered the courtroom during cross-

examination of the victim, or if the unknown spectator at the sentencing hearing had remained in

27

the courtroom.  The state habeas decision is amply supported by the record and is a correct

application of the law, not an unreasonable one.  This court cannot grant habeas relief when the

state court's decision is not unreasonable.

    4.   <u>Failing to Introduce Report of Forensic Exam</u>

    Bass alleges that trial counsel was ineffective for failing to introduce the report of D.B.'s

forensic exam performed on March 15, 2016, and that counsel committed a fraud on the trial

court by representing that there was "no medical evidence."  The state habeas court reasonably

found that Bass established neither deficient performance nor prejudice on this claim.  The

record supports the reasonableness of the state court's decision.

    As a threshold matter, trial counsel did not tell the trial court that there was no medical

evidence *in existence*.  He was arguing the lack of evidence offered by the Commonwealth:

> [W]hen we were presented with this trial there was no doctor's
> report ever *put into evidence* of the changes that the mother
> testified about in her daughter, the changes in her breasts, in her
> buttocks.  There was no medical report, no medical evidence.  No
> doctor testified that these were signs of abuse, these are signs of
> fondling; that these are signs of or injuries that would occur to a
> juvenile only if an adult had done this . . .

R. at 833 (emphasis added).  Because the Commonwealth, which had the burden of proof, did

not put on medical evidence, counsel's strategy was reasonable, and his argument was not a

fraud on the court.

    Bass seems to believe that the report is evidence that no penetration occurred simply

because the hymen could be visualized and there was no swelling, bruising, or other injury to the

vaginal area.  His assumption is completely unfounded.  First, penetration required to accomplish

rape is not full and complete penetration.  Slight penetration is all that is required, "penetration of

any portion of the vulva—which encompasses the 'external parts of the female sex organs

considered as a whole' and includes . . . the labia majora, labia minora, hymen, vaginal opening and vagina." *Love v. Commonwealth*, 441 S.E.2d 709, 712 (Va. Ct. App. 1994). Besides, the report could not come into evidence without the testimony of the examiner who prepared it, who would have testified that the medical literature overwhelmingly recognizes that "[m]ost sexually abused children will not have signs of genital or anal injury, especially when examined nonacutely." Joyce A. Adams, Karen J. Farst, & Nancy D. Kellogg, *Interpretation of Medical Findings in Suspected Child Sexual Abuse: An Update for 2018*, 31 J. of Pediatric & Adolescent Gynecology 225, 225 (2018). Because the report does not and cannot prove that the abuse did not happen, there is no prejudice from failing to introduce it.

Nor was counsel's failure to introduce the report deficient performance. Rather, counsel's decisions regarding what evidence to use are strategic decisions afforded the highest deference. Absent a showing that the decision fell below prevailing professional norms, counsel's word on such matters is the last. *Gonzalez v. United States*, 553 U.S. 242, 249 (2008). The reasonableness of counsel's decision is supported by the negative information that would have come in with the report, helpful to the Commonwealth's case, including the documentation of "[m]ultiple overlapping linear and irregular areas of red/pink/hypo-pigmented area of discoloration" on both the left and right breasts, which her mother stated had been visible for two weeks. Rpt of M. Pond & E. Vick at 10, Plntf's Ex. B, ECF No. 8-4.

Because the state habeas court's decision is reasonable, based on the record, this court cannot grant habeas relief on this claim.

5. Failing to Call a Medical Expert

Bass asserts that trial counsel should have hired a medical expert to explain the significance of the medical findings in the report. The state habeas court found that Bass failed

29

to show either deficient performance or prejudice on this claim.  The state court's factual determinations and legal decision on this issue are eminently reasonable.  Whether to hire an expert witness, and which one to hire, are strategy decisions of counsel that are afforded great deference.  *Whelchel v. Bazzle*, 489 F. Supp.2d 523, 532 (4th Cir. 2006).  Bass has offered no evidence of deficient performance, only speculation that a medical expert would say that the findings undermined D.B.'s credibility.  Based on the medical literature cited previously, the absence of physical injury in sexually abused children is far more common than not.  Further, no expert witness can express an opinion on the credibility or veracity of a witness because that improperly invades the province of the factfinder.  *Pritchett v. Commonwealth*, 557 S.E.2d 205, 208 (Va. 2002).  As the state habeas court noted, Bass did not identify any expert that could or would have testified, nor support for what he believed the expert would say.  Without this, Bass has not properly alleged prejudice.  Because the state court reasonably found neither deficient performance nor prejudice, this court cannot grant habeas relief on this claim.

　　6.　Failing to File a Speedy Trial Motion Before Trial

Because the appellate court held that Bass had waived his speedy trial objection by not filing it in writing before trial, Bass asserts that counsel was ineffective for failing to file such a motion.  The state habeas court found that Bass had shown neither deficient performance nor prejudice.  The court held that counsel could reasonably have determined that filing such a motion would be futile.  This decision was reasonable.  What arguments to make and motions to file are uniquely within the scope of decisions committed to the sound discretion of counsel.  *Gonzalez*, 553 U.S. at 248.  Further, counsel is not required to file a futile motion.  *Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010).

Nor could he establish prejudice because the record supports the habeas court's recognition that a speedy trial motion would have been unsuccessful.  In ruling on the post-trial speedy trial motion, the trial court found that Bass had waived the issue by not raising it before trial; alternatively, however, the court stated that there was no violation of the speedy trial right. R. at 822.  The state habeas court also examined the timeline of continuances and found no violation of the speedy trial right.  Based on the record, this court cannot say that the state court findings are unreasonable:

September 27, 2016, through December 12, 2016 . . . . . . . . . . . . . . . . . . 76 days

December 12, 2016, through March 21, 2017 . . . . . . . . . . . . . . . . . . . . . . tolled

The question is how much of the time from March 21, 2017, through July 11, 2017, should count against the speedy trial clock.  As observed by the state habeas court, defense counsel was not ready to proceed to trial on March 21.  He considered that date to be reserved for setting a new trial date if Bass had been released from Central State Hospital.  The case needed to be set far enough away for counsel to file motions, and the only party who needed to file a motion was Bass.  Because continuance orders must be construed in context with the whole record, *Baity*, 431 S.E.2d at 895, the state court decided that the time between March 21 and July 11 was essentially an extension of the earlier continuances necessitated by Bass's hospitalization.  No amount of objecting "for the record" to speedy trial can change the fact that Bass needed a continuance of the March 21 date.  He still had pretrial motions to file, and he was not prepared to go forward with trial on that date in March.   On March 21, he agreed to the July 11 trial date. At the motion hearing on April 10, counsel acknowledged that he had agreed to July 11 for the trial.  The state habeas court reasonably concluded that the time from March 21 through July 11 was tolled.  Even though a different argument could be made, more favorable to Bass, this

court's role is limited to determining whether the state's decision was reasonable.  The question is not whether the state's decision is correct, but whether it is unreasonable, which is a substantially higher threshold.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Because reasonable minds can disagree, the state's decision cannot be unreasonable.  The court cannot grant relief on this claim.

       7.   Cumulative Error

Bass alleges that counsel's errors were cumulative and amounted to a "complete failure to subject the prosecution to meaningful adversarial testing."  Pet. Att. at 11, ECF No. 1-1.  Ineffective assistance of counsel claims must be reviewed individually.  An attorney's actions or omissions that are not unconstitutional individually cannot be added together to create a constitutional violation.  *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998).  There can be no cumulative effect of non-errors.  *Id.*  The court considers cumulative error only on direct appeal, and then only if the errors so fatally infect the trial that they violate the trial's fundamental fairness.  *United States v. Woods*, 710 F.3d 195, 208 (4th Cir. 2013).  This claim will be dismissed.

**D.  Ineffective Assistance of Appellate Counsel**

Bass alleges that appellate counsel was ineffective for failing to argue on appeal, under the ends of justice exception, that he was denied the right to counsel and denied the right to a public trial.  As the state habeas court recognized, appellate counsel is entitled to choose which legal issues to pursue on appeal; counsel is not required to pursue every possibly meritorious argument that a defendant may wish him to pursue.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Experienced advocates recognize the importance of winnowing out weaker arguments on appeal and focusing on a few key issues.  *Id.* at 751–52.  Appellate counsel pursued several meritorious

arguments, which had a better chance of succeeding than either of the two issues Bass now asserts should have been raised.  Because the state court's decision is factually and legally reasonable, I cannot grant relief on these claims.

## E.  Actual Innocence

Bass asserts that he is actually innocent of the charges, and for this reason, any procedural defaults in his case should be excused.  Actual innocence is not itself a constitutional claim to be raised as grounds for federal habeas relief.  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Rather, a claim of actual innocence, supported by credible new evidence, is a gateway through which a petitioner may pass to allow the federal court to consider an otherwise untimely or defaulted constitutional claim.  *Schlup v. Delo*, 513 U.S. 298, 316 (1995).  Credible new evidence of innocence must be sufficient to persuade the court that a conviction based on a trial with constitutional errors must be reexamined, unlike a conviction following an error-free trial.  *Id.*  To be reliable, the new evidence must be exculpatory, scientific evidence, trustworthy eyewitness testimony, or critical physical evidence that was not presented at trial and that *was not known or able to be known by the defense* at the time of trial.  *Id.* at 324.

The evidence Bass offers is not new.  The forensic report was known to his counsel at the time of trial.  Further, even if it were new, it is not evidence sufficient to raise a reasonable doubt that no reasonable juror would have found the defendant guilty.  *Id.* at 329.  While Bass claims that the forensic exam "proves" his innocence, the exam does no such thing.  Admittedly, it does not prove that D.B. was sexually abused, but given the paucity of physical findings among most sex abuse victims who are not examined immediately after the encounter, the lack of vaginal injury has minimal probative value on guilt or innocence.  Additionally, the report corroborates some other aspects of the Commonwealth's case, such as the unusual discolorations on D.B.'s

breasts.  Because he has not offered any new evidence of actual innocence, Bass has not entered the gateway that could excuse procedural defaults.

## V. CONCLUSION

For the reasons stated, I will grant the respondent's Motion to Dismiss.

I decline to issue a certificate of appealability because Bass has not made a substantial showing of the denial of a constitutional right and reasonable jurists would not find the court's procedural rulings to be debatable or wrong.

A separate Final Order will be entered this date.

Enter:  July 28, 2023

*/s/ Robert S. Ballou*

Robert S. Ballou
United States District Judge